IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jennifer Seay, | ) | C/A No.: 1:15-1104-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

## I. Relevant Background

### A. Procedural History

On August 18, 2012,[1] Plaintiff protectively filed an application for DIB in which she alleged her disability began on June 1, 2010. Tr. at 72, 106–07. Her application was denied initially and upon reconsideration. Tr. at 85–88, 93–94. On March 14, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") John S. Lamb. Tr. at 26–63 (Hr'g Tr.). The ALJ issued an unfavorable decision on April 10, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 8, 2015. [ECF No. 1].

### B. Plaintiff's Background and Medical History

#### 1. Background

Plaintiff was 32 years old at the time of the hearing. Tr. at 33. She obtained a general equivalency diploma ("GED"). *Id.* Her past relevant work ("PRW") was as a child monitor. Tr. at 60. She alleges she has been unable to work since July 1, 2010. Tr. at 33.

---

[1] Plaintiff previously filed an application for DIB on July 17, 2011, that was denied on January 11, 2012. Tr. at 75.

2.      Medical History

Plaintiff developed acute pain in her lower back and right leg in May 2010. Tr. at 197. She initially treated with a chiropractor, but eventually presented to Michael Bucci, M.D. ("Dr. Bucci"). *Id.* Dr. Bucci operated on Plaintiff's back on October 29, 2010. *Id.* Plaintiff continued to experience constant pain in her back and pain and weakness in her right leg. *Id.* Magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine on February 18, 2011, showed no evidence of recurrent disc herniation, but indicated extensive post-operative epidural fibrosis and scar tissue surrounding the right S1 nerve root, as well as some disc degeneration. *Id.*

On March 9, 2011, Plaintiff presented to Eric P. Loudermilk, M.D. ("Dr. Loudermilk"), at Piedmont Comprehensive Pain Management Group ("PCPMG") for a consultation. Tr. at 197–99. Dr. Loudermilk observed Plaintiff to have tenderness in her right gluteal region, but no significant tenderness over her lumbar spinous processes or paraspinous muscles. Tr. at 198. A straight-leg raise test was positive on the right at 30 degrees. *Id.* Plaintiff had diminished sensation to light touch over her the lateral aspects of her right foot and calf. *Id.* She had decreased strength in right thigh flexion and absent Achilles reflex on the right. *Id.* Dr. Loudermilk diagnosed lumbar post-laminectomy syndrome with persistent right lower extremity radiculopathy in the S1 distribution, secondary to epidural fibrosis and scar tissue versus permanent nerve damage. *Id.* He administered a selective right S1 nerve root injection on March 22, 2011. Tr. at 195. He prescribed Lortab 7.5 milligrams for post-operative pain and instructed Plaintiff to continue taking Topamax and Ultracet and to follow up in three to four weeks. Tr. at 196.

Plaintiff followed up with Dr. Loudermilk on April 11, 2011. Tr. at 249. She reported continued pain in her right leg and foot. *Id.* Dr. Loudermilk observed that Plaintiff did not have a reflex in her right ankle and stated it was very suspicious for nerve damage. *Id.* Dr. Loudermilk gave Plaintiff a DVD about spinal cord stimulation and indicated that Plaintiff should consider it because it may allow her to return to school and a status of gainful employment. *Id.*

On May 9, 2011, Plaintiff followed up with Sherri Cheek, APRN ("Ms. Cheek"), at PCPMG. Tr. at 248. She reported that Topamax and Ultracet helped her pain to some degree. *Id.* Plaintiff indicated she had reviewed the information Dr. Loudermilk provided about spinal cord stimulation, but that she was unwilling to go forward with the procedure at that time. *Id.*

Plaintiff presented to Donald R. Johnson, M.D. ("Dr. Johnson"), at Southeastern Spine Institute for a second opinion on September 19, 2011. Tr. at 323–24. Dr. Johnson observed Plaintiff to be somewhat slow in transitioning from a sitting to a standing position. Tr. at 324. He indicated Plaintiff had mild difficulty mounting the examination table, but was able to do so without assistance. *Id.* He indicated Plaintiff had normal and equal bilateral muscle strength at 5/5, except for her right hip flexion, which was 3+/5. *Id.* He noted a positive straight-leg raise on the right. *Id.* Dr. Johnson found Plaintiff to have normal sensation and reflexes. *Id.* He indicated Plaintiff should not pursue further surgery, but would be an excellent candidate for spinal cord stimulation. *Id.* He referred Plaintiff back to Dr. Loudermilk for a spinal cord stimulator ("SCS") trial. *Id.*

On September 26, 2011, Plaintiff reported to Dr. Loudermilk that she had recently visited Dr. Johnson for a second opinion. Tr. at 209. She stated Dr. Johnson had also recommended a SCS and that she desired to proceed with a trial implantation. *Id.* Dr. Loudermilk refilled Plaintiff's prescriptions for Ultracet and Topamax and scheduled her for a SCS trial. *Id.*

Plaintiff received regular chiropractic manipulation between September 2011 and July 2013. Tr. at 255–303. Her chiropractor routinely observed edema, tenderness to palpation, and decreased range of motion in Plaintiff's spine. *Id.*

On October 11, 2011, Dr. Loudermilk implanted dual-lead SCS electrodes for a one-week trial period. Tr. at 200. He indicated that he would refer Plaintiff to a neurosurgeon for permanent SCS implantation if she received greater than 50 percent pain relief during the trial period. Tr. at 201. Plaintiff followed up with Dr. Loudermilk on October 17, 2011, and reported that her right leg pain had improved. Tr. at 208. She expressed a desire to proceed with permanent implantation of a SCS. *Id.* Dr. Loudermilk removed Plaintiff's temporary electrodes and noted no evidence of infection. *Id.* He referred Plaintiff to Dr. Bucci for permanent SCS implantation, recommended Plaintiff continue her prescriptions for Ultracet and Topamax, and prescribed Viibryd for depression. *Id.*

Plaintiff presented to Dr. Bucci on October 24, 2011, to discuss permanent implantation of a SCS. Tr. at 214. Dr. Bucci observed no abnormalities on physical examination. Tr. at 215. He prescribed Wellbutrin SR 150 milligrams for smoking

cessation and indicated Plaintiff would need to be smoke-free for four-to-six weeks before he would proceed with SCS placement. Tr. at 216.

Plaintiff followed up with Dr. Bucci on December 6, 2011, and reported she had stopped smoking. Tr. at 217. Dr. Bucci noted no abnormalities on examination. Tr. at 218. He informed Plaintiff and her family members of the possible complications associated with implantation of a SCS. Tr. at 219. Plaintiff indicated she understood the risks and desired to proceed with surgery. *Id.*

On January 16, 2012, Dr. Bucci performed thoracic laminectomy for implantation of a neurospinal stimulator and electrode paddle and inserted a neurospinal stimulator pulse generator. Tr. at 220–21. Plaintiff was discharged with instructions to avoid heavy lifting, bending, and driving and to follow up in 10 days for a wound check. Tr. at 221. Plaintiff returned to Dr. Bucci's office for suture removal on January 26, 2012. Tr. at 223. She indicated she was unable to differentiate her postoperative pain from her baseline pain. *Id.* Plaintiff had some drainage from her incision site, and Dr. Bucci ordered a prescription for Minocycline. *Id.*

Plaintiff presented to Bon Secours Health System on May 6, 2012, for increased back pain and a discharge from her nerve stimulator site. Tr. at 309. Plaintiff demonstrated normal range of motion, no edema, and no tenderness. Tr. at 311. Plaintiff's white blood cell count was normal. Tr. at 312. She was instructed to continue her medications. Tr. at 314–15.

Plaintiff followed up with Dr. Bucci on May 8, 2012, for a wound check. Tr. at 224. Dr. Bucci noted one small area in the stimulator's battery site that had a slight hole,

but he observed no significant drainage. *Id.* He stated he cultured a small area, but was unsure whether he obtained enough fluid for a successful culture. *Id.* Dr. Bucci instructed Plaintiff to take her temperature two to three times per day and to contact his office if she observed an elevated temperature. *Id.*

On July 17, 2012, Dr. Bucci noted that Plaintiff had stopped smoking and had lost quite a bit of weight. Tr. at 225. He indicated Plaintiff's improved physical condition had resulted in her not using her SCS very often and that Plaintiff desired to have the stimulator removed because it was causing her some pain. *Id.* He stated that Plaintiff's stimulator wound showed some signs of infection in the past, but that the infection had resolved. *Id.* Dr. Bucci indicated he explained to Plaintiff the possible complications of surgery and that she consented to proceed with removal of the SCS. Tr. at 227.

Plaintiff underwent surgical removal of her SCS and wound revision on July 20, 2012. Tr. at 228–29. Dr. Bucci indicated there were several areas of skin thinning around the battery site, but that Plaintiff had no signs of infection. Tr. at 229. He discharged Plaintiff with prescriptions for Percocet 10/325 milligrams for pain and Minocycline 100 milligrams for wound prophylaxis. *Id.*

Plaintiff presented to Dr. Bucci's office for suture removal on July 30, 2012. Tr. at 231. Her incision sites showed no sign of infection. *Id.* Plaintiff indicated she began to experience neck pain immediately after waking from surgery. *Id.* She described the pain as traveling from the back of her right ear to the top of her head and radiating through her head with side-to-side rotation. *Id.*

Plaintiff followed up with Dr. Loudermilk on August 31, 2012, for pain in her lower back and right leg. Tr. at 247. Dr. Loudermilk prescribed a Medrol Dosepak to reduce the inflammation in Plaintiff's back and leg. *Id.* He prescribed 50 milligrams of Ultram for pain and instructed Plaintiff to take one to two tablets every six hours, as needed. *Id.* He also wrote prescriptions for Topamax and Viibryd and instructed Plaintiff to follow up in four weeks. *Id.*

On September 14, 2012, Plaintiff indicated to Dr. Loudermilk that the Medrol Dosepak he prescribed at her last visit had helped for several days, but that her pain had returned to its baseline. Tr. at 246. Plaintiff indicated she was doing better on her medications and that she did not desire to proceed with reimplantation of her SCS at that time. *Id.*

State agency medical consultant Hugh Clarke, M.D., reviewed the record and completed a physical residual functional capacity ("RFC") assessment on November 2, 2012. Tr. at 67–69 He found Plaintiff to be limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and avoid concentrated exposure to hazards. *Id.*

Plaintiff followed up with Dr. Loudermilk on November 9, 2012. Tr. at 245. She indicated Viibryd had worked extremely well for depression, but that her insurance company would not authorize it. *Id.* Dr. Loudermilk indicated he would give her samples

8

of the medication. *Id.* Plaintiff complained of an increase in headaches. *Id.* Dr. Loudermilk indicated he was unable to discern from Plaintiff's description whether her headaches were migraine headaches or tension headaches and would prescribe both Flexeril and Maxalt to treat them. *Id.* Plaintiff reported continued pain in her lower back and right leg, as well as some pain at the former site of her SCS in her thoracic region. *Id.* Dr. Loudermilk indicated the pain in Plaintiff's thoracic spine likely resulted from scar tissue. *Id.* Plaintiff indicated she did not desire further surgery or reimplantation of her SCS. *Id.*

On November 21, 2012, an MRI of Plaintiff's cervical spine showed a moderate-sized disc bulge and an annular tear at C6-7. Tr. at 240. An MRI of her thoracic spine indicated signal changes between the T9 and T10 spinous processes and within the overlying dermal fat site of the previous electrode leads. Tr. at 241. Plaintiff had a mild disc bulge at T10-11, mild T8-9 disc degeneration and right paracentral disc protrusion, and small right paracentral disc protrusions at T5-6 and T6-7. *Id.*

On December 13, 2012, state agency medical consultant Ted Roper, M.D., reviewed the record and imposed the same restrictions as Dr. Clarke imposed in November 2012. Tr. at 78–80.

Plaintiff presented to Meredith Purgason, APRN ("Ms. Purgason"), at PCPMG on January 7, 2013. Tr. at 244. She reported continued pain in her neck, mid-back, and arms. *Id.* She also complained of frequent migraine headaches. *Id.* Ms. Purgason discussed with Plaintiff the results of her recent cervical and thoracic MRIs and options for treatment, including injections and physical therapy. *Id.* Plaintiff indicated she desired to continue

9

taking her medications and would consider the other options. *Id.* Ms. Purgason refilled Plaintiff's medications and recommended she follow up in two months. *Id.*

Plaintiff followed up with Ms. Purgason on March 4, 2013, and reported that Ultram was not adequately controlling her pain. Tr. at 254. Ms. Purgason suggested Plaintiff undergo injections or participate in physical therapy, but Plaintiff indicated she was unable to afford either treatment. *Id.* Ms. Purgason refilled Plaintiff's medications and prescribed Butrans patches to help with overall pain control. *Id.*

On April 1, 2013, Plaintiff reported increased pain. Tr. at 253. Dr. Loudermilk indicated he would increase the dosages of the Butrans patch and Viibryd. *Id.* Dr. Loudermilk again informed Plaintiff that they could attempt reimplantation of a SCS, but Plaintiff was reluctant to pursue further surgery because of her prior infection. *Id.*

Plaintiff followed up with Dr. Loudermilk on April 29, 2013, and reported significant pain in her back and right leg, despite the recent adjustment to her Butrans patches. Tr. at 308. She reported her migraine headaches were sometimes accompanied by nausea and requested anti-nausea medication. *Id.* Dr. Loudermilk increased Plaintiff's Butrans patch to the highest dosage, prescribed Phenergan for nausea, and refilled Plaintiff's other medications. *Id.* He again discussed reimplantation of a SCS, but Plaintiff remained reluctant to pursue that option. *Id.*

Plaintiff again presented to Dr. Loudermilk on May 20, 2013. Tr. at 320. She reported significant pain in her neck and upper back. *Id.* Plaintiff indicated the Butrans patches were not helping her pain, and Dr. Loudermilk discontinued the prescription. *Id.*

Plaintiff expressed a desire to continue with conservative treatment and to avoid reimplantation of a SCS. *Id.* Dr. Loudermilk prescribed Gralise for pain. *Id.*

On June 17, 2013, Plaintiff reported to Ms. Purgason that she had completely weaned off the Butrans patch because she did not feel that it was helping. Tr. at 306. She indicated Gralise reduced her leg pain at night, but resulted in significant sedation the next day. *Id.* Ms. Purgason recommended Plaintiff decrease her Gralise dosage from 1800 milligrams to 1200 milligrams. *Id.*

Plaintiff followed up with Ms. Purgason on August 5, 2013. Tr. at 305. She reported her pain remained stable on the prescribed medications. *Id.* Plaintiff requested medication to help with smoking cessation, and Ms. Purgason prescribed Chantix and refilled Plaintiff's other medications. *Id.*

Plaintiff presented to Candace Mothershead, PA-C ("Ms. Mothershead"), at PCPMG on September 30, 2013. Tr. at 319. She reported her pain remained stable on the prescribed medications. *Id.* Plaintiff indicated she had been unable to afford Chantix for smoking cessation. *Id.* Ms. Mothershead indicated she would look into patient assistance programs that may be available to help Plaintiff obtain Chantix and Viibryd. *Id.* She refilled Plaintiff's medications and instructed her to follow up in two months. *Id.*

Plaintiff followed up with Ms. Mothershead on November 25, 2013. Tr. at 317. She reported that Topamax caused bad dreams, and Ms. Mothershead suggested she take it in the morning instead of the evening. *Id.* Plaintiff reported no additional adverse effect from her medications, and Ms. Mothershead refilled her prescriptions. *Id.*

On July 23, 2014, Dr. Loudermilk wrote a letter indicating that Plaintiff's condition was initially severe enough to require placement of a SCS. Tr. at 325. He stated Plaintiff developed an infection when Dr. Bucci implanted the SCS that necessitated the removal of the SCS because Plaintiff could develop life-threatening meningitis if the infection spread through the electrodes to the spinal canal. *Id.* Dr. Loudermilk indicated Plaintiff's condition continued to be severe and that she may benefit from another SCS implantation.

      C.      The Administrative Proceedings

            1.      The Administrative Hearing

                  a.      Plaintiff's Testimony

At the hearing on March 14, 2014, Plaintiff testified she experienced severe pain from her neck through her back. Tr. at 34. She indicated a disc ruptured in her spine in June 2010 and that she underwent spinal laminectomy surgery in October 2010 that failed to relieve her pain. Tr. at 34, 37. She stated she was diagnosed with failed back syndrome and underwent SCS trial and permanent implantation. Tr. at 37–38. She indicated her SCS was subsequently removed because of an infection, after she stopped smoking and lost weight. Tr. at 38–39.

Plaintiff described her pain as radiating from her low back to her right leg. Tr. at 45. She stated her pain was a five to six out of a maximum of 10. *Id.* She denied mental impairment. Tr. at 47.

Plaintiff testified she visited a spinal specialist in Mount Pleasant who told her that her only option would be spinal fusion. Tr. at 50. She indicated the doctor discouraged

her from undergoing discectomy and fusion because of her age and the possibility that it may cause her more pain. *Id.*

Plaintiff testified she experienced migraine headaches at least twice a week that lasted for an entire day. Tr. at 51–52. She stated her migraines caused her to vomit constantly and be sensitive to light. Tr. at 52. She described her migraine-related pain as a seven to eight on a 10-point scale. *Id.* She indicated her pain was reduced by Topamax. *Id.*

Plaintiff testified she had difficulty walking long distances, climbing stairs, and operating the pedals in her car with her right leg. Tr. at 50–51. She stated she could walk on a treadmill for less than 15 minutes. Tr. at 58. She indicated she had difficulty sitting and could only sit for 10 minutes at a time. Tr. at 51. She stated rotating her neck from side-to-side and flexing her neck up and down increased her pain. Tr. at 52. She indicated she could only sit and use a computer for 15 to 20 minutes at a time. Tr. at 53. She stated that if she attempted to use her computer for longer periods, she experienced right arm pain, burning between her shoulder blades, and shooting pain to her wrist and down her leg. Tr. at 53.

Plaintiff testified she took Ultram, Flexeril, Phenergan, Topamax, and ibuprofen. *Id.* She indicated she did not take narcotic pain medications because she did not feel she could adequately care for her three children while taking narcotics. *Id.*

Plaintiff testified she lived with her two children, ages 14 and six. Tr. at 55. She indicated her 14-year-old helped her to perform household chores and to care for her six-year-old. Tr. at 55. She stated a typical day involved her lying on the couch and

alternating ice and heat during the time that her six-year-old was in school. Tr. at 55–56. She indicated that she assisted her six-year-old with his homework, prepared a light dinner, and usually performed one household chore per day. Tr. at 56. She stated she did the grocery shopping, but tried to shop for no more than 20 minutes at a time. *Id.* She indicated she experienced shaking and muscle spasms in her right leg if she overexerted herself and that she had fallen before. Tr. at 57. She stated she developed numbness from the right side of her foot to the midpoint of her right leg following surgery. Tr. at 58. She indicated she visited a chiropractor twice a week. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Pedro Roman reviewed the record and testified at the hearing. Tr. at 59–63. The VE categorized Plaintiff's PRW as a child monitor, *Dictionary of Occupational Titles* ("*DOT*") number 301.677-010, as medium in exertion with a specific vocational preparation ("SVP") of three. Tr. at 60. The ALJ asked if Plaintiff would have any transferable skills to the light exertional level. *Id.* The VE testified that Plaintiff would have transferable skills to the light job of companion, but would have no transferable skills to sedentary occupations. Tr. at 60–61. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the sedentary exertional level with the following restrictions: never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally bend, stoop, balance, crouch, or crawl; and must avoid concentrated exposure to hazards. Tr. at 61. The VE testified that the hypothetical individual could not perform Plaintiff's PRW, but could perform sedentary jobs with an SVP of two as a finisher, *DOT* number 713.687-018, with 592

14

positions in South Carolina and 29,207 positions in the national economy; a telemarketer, *DOT* number 299.357-014, with 2,759 positions in South Carolina and 357,558 positions in the national economy; and a telephone quotation clerk, *DOT* number 237.367-046, with 1,001 positions in South Carolina and 86,942 positions in the national economy. Tr. at 61–62. The ALJ asked the VE to define a sit/stand option as the term is normally used in an occupational setting. Tr. at 62. The VE indicated a sit/stand option would mean that the individual could stand or walk for at least four hours in an eight-hour workday and sit or stand as she pleased, without interruption of work. Tr. at 62. The ALJ asked the VE to add the option to sit and stand at-will to the prior hypothetical question and asked if there would be jobs the individual could perform. *Id.* The VE indicated the individual could perform the jobs of telemarketer and telephone quotation clerk, as long as she stayed within a reasonable degree of productivity. *Id.*

Plaintiff's attorney asked the VE to assume the same restrictions in the hypothetical questions posed by the ALJ, but to also assume that the individual would require breaks on an unpredictable and fairly frequent basis. *Id.* He asked the VE to indicate the number of absences that would be considered acceptable in an unskilled work environment. Tr. at 62–63. The VE indicated unskilled work would typically allow for no more than 10 absences per year and that more than 10 absences would preclude employment. Tr. at 63.

2.    The ALJ's Findings

In his decision dated April 10, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2012.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2010 through her date last insured of September 30, 2012 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease cervical and thoracic spine with accompanying pain and status post lumbar laminectomy syndrome with persistent right lower extremity pain (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). I specifically find that she can lift or carry up to 10 pounds occasionally or frequently, and she can sit, stand or walk 4 hours each of an 8-hour workday. I also find that she can never climb a ladder, rope or scaffold; she can occasionally climb ramps or stairs, bend, stoop, balance, crouch or crawl. Furthermore, she should avoid concentrated exposure to hazards.

      In the alternative, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). I specifically find that she can lift or carry up to 10 pounds occasionally or frequently, and she can sit, stand or walk 4 hours each of an 8-hour workday. The claimant should also be allowed to perform work with a sit/stand option at will, as defined by the vocational expert. I also find that she can never climb a ladder, rope or scaffold; she can occasionally climb ramps or stairs, bend, stoop, balance, crouch or crawl. Furthermore, she should avoid concentrated exposure to hazards.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on September 9, 1981, and was 31 years old, which is defined as a younger individual age 18–44, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated [sic] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2010, the alleged onset date, through September 30, 2012, the date last insured (20 CFR 404.1520(g)).

Tr. at 14–21.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ did not adequately consider Dr. Loudermilk's opinion; and

2)      the ALJ's assessment of Plaintiff's credibility was not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See*

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Treating Physician's Opinion

Dr. Loudermilk completed a questionnaire on March 5, 2013. Tr. at 251. He indicated that Plaintiff would probably have to rest away from her work station for more than an hour during an eight-hour workday. *Id.* He stated Plaintiff would likely miss more than three days of work per month. *Id.* Dr. Loudermilk indicated that Plaintiff would likely have problems with attention and concentration sufficient to frequently interrupt

tasks. *Id.* He stated Plaintiff's diagnoses included failed back syndrome, sciatic nerve damage, and migraine headaches. *Id.* He explained that his opinion was based on his continued treatment of Plaintiff since March 22, 2011, objective data that included MRIs and records from other physicians, physical examinations, and Plaintiff's subjective reports. *Id.*

On March 7, 2013, Dr. Loudermilk wrote a letter to Plaintiff's attorney indicating that Plaintiff's diagnoses included chronic pain and weakness in her back and right leg, sciatic nerve damage, and chronic migraine headaches. Tr. at 250. Dr. Loudermilk indicated he did not feel Plaintiff was able to maintain a status of full-time, gainful employment. *Id.* He stated Plaintiff would routinely miss work due to flare-ups of her pain. *Id.* He indicated Plaintiff's pain and medications would likely affect her concentration and job performance. *Id.* He noted Plaintiff had been a reliable and compliant patient with legitimate complaints that were likely permanent and would require long-term pain management. *Id.*

Plaintiff argues the ALJ improperly rejected the work-preclusive limitations specified by Dr. Loudermilk. [ECF No. 10 at 20]. She maintains the ALJ did not consider the relevant factors in 20 C.F.R. § 404.1527(c), including the length of her treatment relationship with Dr. Loudermilk and Dr. Loudermilk's pain management specialization. *Id.* at 23. She contends the ALJ erred in rejecting Dr. Loudermilk's opinion based on statements in the record that suggested her medications provided relief and that her condition was stable because those statements did not equate to a suggestion that she was capable of engaging in sustained work activity. *Id.* at 24.

The Commissioner argues the ALJ properly evaluated Dr. Loudermilk's opinion and determined that it was not entitled to controlling weight. [ECF No. 11 at 9]. She maintains the ALJ properly concluded that Dr. Loudermilk's opinion statements were contradicted by his treatment notes. *Id.* at 11, 13–14. She contends the ALJ's analysis of Dr. Loudermilk's opinion statements was consistent with controlling regulations, which do not require that an ALJ expressly discuss each factor set forth in 20 C.F.R. § 404.1527(c). *Id.* at 11.

Plaintiff argues the Commissioner cannot rely on a post hoc argument that Dr. Loudermilk's opinions were not supported by objective examinations because the ALJ did not specify a lack of objective support as a reason for rejecting the opinions. [ECF No. 12 at 2–3]. She concedes that the ALJ was not required to expressly discuss each factor in 20 C.F.R. § 404.1527(c), but maintains the ALJ did not demonstrate that he considered and applied the relevant factors. *Id.* at 4. She contends the Commissioner cites no evidence to suggest the ALJ relied upon actual inconsistencies between Dr. Loudermilk's opinions and his records. *Id.* at 5. Finally, she argues the ALJ erred in concluding that Dr. Loudermilk's opinion was an opinion on an issue reserved to the Commissioner and failed to address the work-preclusive limitations specified in his letter. *Id.* at 6.

The Social Security Administration's ("SSA's") regulations require that ALJs carefully consider medical source opinions of record. SSR 96-5p. ALJs must accord controlling weight to the opinions of treating physicians that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not

inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2). If a treating source's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ may decline to give controlling weight to the opinion. However, a finding that a treating physician's opinion is not entitled to controlling weight does not end consideration of the opinion, and the ALJ must proceed to weigh the treating physician's opinion, along with all other medical opinions of record, based on the factors set forth in 20 C.F.R. § 404.1527(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

Not only does 20 C.F.R. § 404.1527(c) specify the relevant factors to be considered in assessing medical opinions, it also provides guidance in weighing those factors. A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary

evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[4] Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5).

An ALJ is not required to expressly discuss each factor set forth in 20 C.F.R. § 404.1527(c), but his decision should demonstrate that he considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). This court should not disturb an ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

The ALJ considered Dr. Loudermilk's opinion as follows:

Erik Loudermilk, M.D., of Piedmont Comprehensive Pain Management, the claimant's treating physician, wrote a statement and completed a questionnaire concerning the claimant on March 7, 2013 (Exhibit 8F). Dr. Loudermilk stated the claimant's diagnoses were failed back syndrome and chronic pain in her lower back and right leg, sciatic nerve damage and chronic migraines. Dr. Loudermilk opined, "I do not feel she is able to maintain a status of full time gainful employment due to her condition." He further opined the claimant would miss work due to flare-ups in her pain and her pain and her medications would likely affect her concentration to frequently interrupt tasks during the day (Exhibit 8F). I have given limited weight to this opinion. Dr. Loudermilk's medical records show the claimant's medication helps and she tolerates them without any adverse effect (Exhibit 11F). His records also show her pain remained stable on the medications (Exhibit 11F) and her pain continued to be managed by her medications (Exhibit 14F). While a treating physician, his opinion that the claimant is disabled is an opinion on an issue that is reserved to the Commissioner and is, thus, not entitled to controlling weight (SSR 96-5p).

Tr. at 19.

The ALJ erred to the extent that he discredited Dr. Loudermilk's opinion as an opinion on an issue reserved to the Commissioner. The regulations provide that the following issues are not medical opinions, but are instead administrative findings reserved to the Commissioner: (1) whether an individual's impairments meet or are equivalent in severity to the requirements of any impairments in the listings; (2) the individual's RFC; (3) whether the individual's RFC prevents her from doing PRW; (4) how the vocational factors of age, education, and work experience apply; and (5) whether the individual is disabled under the Social Security Act. SSR 96-5p, citing 20 C.F.R. § 404.1527(e). In contrast to medical opinions, treating source statements on issues reserved to the Commissioner are not entitled to controlling weight or any particular deference, but they must be considered. *Id.* The ALJ correctly asserted that Dr.

Loudermilk's opinion addressed an issue reserved to the Commissioner. *See* Tr. at 19; *see also* Tr. at 250 ("I do not feel she is able to maintain a status of full-time gainful employment due to her condition."). However, the ALJ ignored other elements of Dr. Loudermilk's statements that did not address issues reserved to the Commissioner and that should have been evaluated based on the criteria in 20 C.F.R. § 404.1527(c). *See* Tr. at 250 ("Jennifer has chronic pain and weakness in her back and right leg, and I have diagnosed her with sciatic nerve damage. She also suffers from migraine headaches. . . . . She would routinely miss work due to flare-ups in her pain, and her pain and medications would likely affect her concentration and job performance. . . . I have found her to be a reliable and compliant patient, and her complaints are legitimate."); *see also* 20 C.F.R. § 404.1527(a) (defining medical opinions as statements from acceptable medical sources that reflect judgments about the nature and severity of an individual's impairments, including symptoms, diagnosis and prognosis, what the individual can still do despite her impairments, and her physical or mental restrictions).

The undersigned recommends the court find the ALJ's decision does not reflect adequate consideration of the relevant factors in 20 C.F.R. § 404.1527(c). Although the ALJ indicated Dr. Loudermilk was employed by PCPMG, he did not assess Dr. Loudermilk's specialization as a pain management physician in weighing his opinion. This was a particularly relevant factor because Dr. Loudermilk specifically addressed the effects of Plaintiff's pain on her ability to work. *See* Tr. at 250, 251. As Plaintiff's pain management physician, Dr. Loudermilk was the physician best situated to assess the effects of Plaintiff's pain. *See* 20 C.F.R. § 404.1527(c)(5).

Furthermore, the ALJ's decision does not indicate that he considered Plaintiff's treatment history in weighing Dr. Loudermilk's opinion. *See* 20 C.F.R. § 404.1527(c). Dr. Loudermilk explained that he based his opinion on objective data, which included MRIs and records from other physicians, physical examinations, and Plaintiff's subjective reports. Tr. at 251; *see also* 20 C.F.R. § 404.1527(c)(3); *Stanley*, 116 F. App'x at 429. With the exception of an incomplete summary of Dr. Loudermilk's findings on March 22, 2011, the ALJ failed to discuss any of Dr. Loudermilk's treatment observations. *See* Tr. at 18–19. The record indicates Plaintiff treated specifically with Dr. Loudermilk on 12 occasions between March 2011 and May 2013 and with other providers Dr. Loudermilk supervised during seven additional visits. *See* Tr. at 195, 197–99, 200–01, 208, 209, 245, 246, 247, 249, 253, 308, 320.

Plaintiff reported increased pain, and Dr. Loudermilk observed abnormalities during multiple treatment visits. During an initial assessment on March 9, 2011, Dr. Loudermilk observed Plaintiff to have tenderness in her right gluteal region; positive straight-leg raise on the right at 30 degrees; diminished sensation to light touch over the lateral aspects of her right foot and calf; decreased strength in right thigh flexion; and absent Achilles reflex on the right. Tr. at 198. On April 11, 2011, Dr. Loudermilk observed that Plaintiff did not have a reflex in her right ankle and stated it was very suspicious for nerve damage. Tr. at 249. After her SCS was removed, Plaintiff followed up with Dr. Loudermilk on August 31, 2012, and reported pain in her lower back and right leg. Tr. at 247. Dr. Loudermilk noted inflammation in Plaintiff's back and leg and prescribed a Medrol Dosepak. *Id.* On September 14, 2012, Plaintiff indicated to Dr.

Loudermilk that she had obtained some relief while taking the Medrol Dosepak, but that her pain had returned to its baseline. Tr. at 246. Plaintiff complained of increased headaches and pain in her lower back, right leg, and thoracic spine on November 9, 2012. Tr. at 245. Plaintiff indicated Ultram was not adequately controlling her pain on March 4, 2013. Tr. at 254. On April 1, 2013, Plaintiff reported increased pain. Tr. at 253. On April 29, 2013, Plaintiff informed Dr. Loudermilk that she continued to experience significant pain in her back and right leg. Tr. at 308. Plaintiff reported severe pain in her neck and back to Dr. Loudermilk on May 20, 2013. Tr. at 320.

Although the ALJ discredited Dr. Loudermilk's opinion based on the supportability and consistency factors, he did not cite significant evidence to support his conclusions. While both Dr. Loudermilk and the ALJ cited Plaintiff's MRI reports, the ALJ declined to explain how the MRI reports did not support Dr. Loudermilk's opinion. *See Compare* Tr. at 15–16, *with* Tr. at 251. The ALJ asserted that treatment records showed Plaintiff to be tolerating her medication without adverse effects, which is supported by some treatment records. *See* Tr. at 19; *see also* Tr. at 244 (Plaintiff reported to Ms. Purgason on January 7, 2013, that she felt the medications were helping "some" and that she tolerated them without adverse effects), 306 (Ms. Purgason stated "[o]verall, she feels these medications continue to help and she tolerates them without adverse effects" on June 17, 2013), 305 (Ms. Purgason indicated Plaintiff's pain remained stable on Ultram, Gralise, Topamax, Viibryd, Imitrex, and Phenergan and that Plaintiff tolerated the medications without adverse effects on August 5, 2013), 319 (On September 30, 2013, Ms. Mothershead indicated Plaintiff's medication continued to help and that she

tolerated her medication without side effects), 317 (On November 25, 2013, Ms. Mothershead indicated Plaintiff's pain continued to be managed by her medications and that Plaintiff tolerated her medications without adverse effects.). However, the ALJ ignored other evidence that Plaintiff experienced side effects from her medications and required medication adjustments to address increased pain. *See* Tr. at 245 (Maxalt and Flexeril prescribed to treat increase in headaches), 253 (dosage of Butrans patch increased to address pain), 254 (Butrans patch prescribed to treat increased pain), 306 (Ms. Purgason reduced Gralise dose from 1800 to 1200 milligrams to address next-day sedation), 308 (Phenergan prescribed to treat medication-induced nausea and Butrans patch increased to highest dose to treat pain), 317 (Ms. Mothershead instructed Plaintiff to take Topamax in the morning to address complaints of nightmares, 320 (Butrans patch discontinued and Gralise prescribed for pain). Plaintiff's pain did not stabilize until after Dr. Loudermilk prescribed Gralise in May 2013. *See* Tr. at 305, 306, 317, 319. In light of the foregoing, the undersigned recommends the court find the ALJ did not cite substantial evidence to support his decision to accord little weight to Dr. Loudermilk's opinion.

2.    Credibility

Plaintiff argues the ALJ failed to provide adequate support for his credibility finding. [ECF No. 10 at 27]. She contends the ALJ based his credibility determination on disputed facts regarding the removal of her SCS and did not adequately consider her explanation and Dr. Loudermilk's records in assessing the facts. *Id.* at 28–29. She cites several inconsistencies in the treatment record that undermine Dr. Bucci's indication that her SCS was removed because she had lost weight and no longer needed it, including a

lack of notation of significant weight loss and evidence that she had been prescribed antibiotics before she reported to the emergency room. *Id.* at 29–30. She contends the ALJ found her less credible because she did not try other treatment methods, but failed to consider her inability to afford other treatment. Tr. at 30. She argues the ALJ found she had not received the type of medical treatment "one would expect from a totally disabled individual," but failed to specify the course of treatment he would have expected a disabled individual to pursue. *Id.* at 31.

The Commissioner argues the ALJ properly considered Plaintiff's statements, her testimony, her treatment history, the type of treatment she received, and the statements of her medical sources. [ECF No. 11 at 15]. She maintains the ALJ reached a reasonable conclusion about Plaintiff's credibility based on evidence from Dr. Bucci and other providers that failed to suggest an infection at the site of her SCS. *Id.* at 15–16.

Plaintiff argues that the Commissioner erred in stating that her SCS was removed for nonmedical reasons. [ECF No. 12 at 7]. Although she concedes there is conflicting evidence in the record as to whether the SCS was removed because of an infection, she maintains the evidence still showed the SCS was causing her pain and that her skin was thinned in the area around the SCS's battery due to pressure erosion. *Id.* She contends that the ALJ should have considered whether she could have reasonably concluded that her SCS caused an infection and whether it was proper for the ALJ to discount her credibility based upon reasonably-contested information. *Id.* at 8. Finally, she points out that the Commissioner neglected to address her contentions that the ALJ did not consider

her inability to afford treatment and did not indicate which treatment she failed to pursue that would have suggested she was disabled. *Id.* at 9.

"[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. SSR 96-7p. To adequately assess a claimant's credibility, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard a claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.* After having established the existence of a condition reasonably likely to cause the alleged symptoms, a claimant may "rely exclusively on subjective evidence to prove" the intensity, persistence, and functionally-limiting effects of her symptoms. *See Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). Furthermore, the ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* Although this court must defer to the ALJ's findings of fact, the court is not required to "credit even those findings contradicted by undisputed evidence." *Hines*, 453 F.3d at 566, citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion . . . .").

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. at 18. He provided he had "no choice, but to draw inferences from the claimant's inconsistencies in her testimony and the objective medical evidence in the records" and proceeded to set forth perceived inconsistencies. *Id.*

He indicated Plaintiff's testimony that she had her SCS removed because of infection was inconsistent with the evidence. Tr. at 18–19. He stated "[a]lthough the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely credible." Tr. at 19.

He found that Plaintiff's credibility was "further compromised by her insistence on not trying other treatment methods like physical therapy or epidural steroid injections (Exhibit 7F). *Id.* He stated Plaintiff had not "generally received the type of medical treatment one would expect for a totally disabled individual." *Id.* He further indicated Plaintiff had desired to stay on non-narcotic medications and that her medical records "note she is stable and is not having any adverse effects from her medications (Exhibit 11F)." *Id.*

The undersigned recommends the court find the ALJ did not adequately consider the entire case record in determining Plaintiff's credibility. The ALJ set forth several reasons for his finding that Plaintiff's statements were not entirely credible, but each of these reasons is flawed.

First, the ALJ indicated he could not find Plaintiff entirely credible because she provided inconsistent information about the reason for removal of her SCS. *See* Tr. at 18–19. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p. In examining the consistency of an individual's statements, the ALJ should consider the degree to which the individual's statements are consistent with medical signs and laboratory findings and other information provided by medical sources; the consistency of the individual's statements, including those made in connection with the disability claim and those made to treating and examining medical sources; and the consistency of the individual's statements with other information in the case record, including reports and observations from others concerning the individual's daily activities, behavior, and efforts to work. *Id.* A review of the record does not reveal inconsistencies in Plaintiff's statements regarding the reason for the SCS's removal. *See* Tr. at 246 (Plaintiff indicated to Dr. Loudermilk that she did not want to proceed with reimplantation of a SCS because her prior system was removed as a result of infection), 253 (Plaintiff did not want to obtain a new SCS because of prior infection), 308 (Plaintiff remained reluctant to pursue reimplantation of a SCS because of a previous infection following her first implant), 320 ("We have discussed reimplantation of her spinal cord stimulator system but she has been reluctant due to a previous infection."). Contrary to the ALJ's assertion, the record substantiates that Plaintiff developed an infection at the SCS site. *See* Tr. at 225 ("She did have some signs of wound infection however currently this is not the case.), 312 ("sts has spinal cord stimulator implanted and has gotten infected, was placed on abx Thursday

And has gotten worse, no[w] has left leg pain also"). It also indicates that Plaintiff developed pain at the site of her SCS. *See* Tr. at 225 ("She is having some back pain from the stimulator and desires for it to be removed."), 229 ("The battery site incision had several areas of skin thinning due to pressure from the battery."), 245 ("[S]he has some pain in her thoracic region at the site of her previous spinal cord stimulator. This is most likely due to some scar tissue."). To the extent that there is a conflict in the evidence, it is over whether the infection necessitated removal of the SCS. Dr. Bucci indicated he was removing the SCS because it was causing Plaintiff pain and because she was not using it often because she had lost weight and stopped smoking. Tr. at 225, 227, 229. Dr. Loudermilk indicated an infection always necessitated removal of a SCS because of the potential for it to cause life-threatening meningitis.[5] Tr. at 325. The record does not resolve this conflict, and it was not unreasonable for Plaintiff to believe that the infection necessitated removal of her SCS based on the pain she experienced, her history of infection at the SCS site, and her treating pain management physician's opinion. In light of this evidence, it appears the ALJ did not consider all the relevant factors in assessing the consistency of Plaintiff's statements regarding removal of the SCS with the other information in the case record.

The ALJ next cited Plaintiff's failure to pursue physical therapy or epidural steroid injections as a reason for discounting her credibility, but this reason is equally flawed because of the ALJ's failure to consider the entire record. On March 4, 2013, Plaintiff

---

[5] Dr. Loudermilk's opinion was submitted after the ALJ's decision, but was considered by the Appeals Council. *See* Tr. at 4.

discussed with Ms. Purgason the possibility of injections and physical therapy and Plaintiff indicated that she was unable to afford either treatment because she had no income. Tr. at 254. Pursuant to SSR 96-7p, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See* 20 C.F.R. § 404.1530. Fourth Circuit precedent directs that ALJs may not deny benefits to claimants who lack the financial resources to obtain treatment. *See Lovejoy v. Heckler,* 790 F.2d 1114, 1117 (4th Cir.1986) (holding that the ALJ erred in determining that the plaintiff's impairment was not severe based on her failure to seek treatment where the record reflected that she could not afford treatment); *Gordon v. Schweiker,* 725 F.2d 231, 237 (4th Cir.1984) ("it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him"). When a claimant alleges an inability to afford treatment and an ALJ considers the failure to obtain treatment as a factor that lessens the claimant's credibility, the ALJ must make specific findings regarding the claimant's ability to afford treatment. *See Dozier v. Colvin*, No. 1:14-29-DCN, 2015 WL 4726949, at *4 (D.S.C. Aug. 10, 2015) (remanding the case because the ALJ did not include specific factual findings regarding the resources available to the plaintiff and whether "her failure to seek additional medical treatment was based upon her alleged inability to pay"). Here, the ALJ did not consider evidence of record that Plaintiff lacked the ability to pay for physical therapy and injections and used

her failure to pursue these treatments to discount her credibility. In light of the ALJ's failure to consider and make specific findings regarding Plaintiff's ability to afford additional treatment, the undersigned recommends the court find that he impermissibly relied upon Plaintiff's failure to obtain additional treatment as a factor that lessened her credibility.

The ALJ found Plaintiff's statements not entirely credible because she had "not generally received the type of medical treatment one would expect for a totally disabled individual." Tr. at 19. "In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements." SSR 96-7p. "[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." *Id.* Plaintiff's treatment history included an unsuccessful surgery, implantation of a SCS, and complications at the SCS site that necessitated its removal.[6] *See* Tr. at 197, 228–29. Following removal of her SCS, Plaintiff received regular pain management treatment from Dr. Loudermilk. Tr. at 243–49, 252–54, 304–08, 317–20. Plaintiff was told that she was not a good candidate for further surgery. Tr. at 324. Although Dr. Loudermilk indicated Plaintiff could undergo

---

[6] Although the record failed to resolve whether the SCS was removed because of infection or increased pain, the undersigned considers that both infection and increased pain were valid reasons to remove the SCS.

reimplantation of a SCS, Plaintiff was reluctant to pursue that course of treatment because of her experience with the first SCS. *See* Tr. at 245, 246, 253, 308, 320. The ALJ pointed out that Plaintiff did not want to take narcotic medications. Tr. at 19. However, Plaintiff and Dr. Loudermilk had agreed that it was best she not take long-acting narcotics. *See* Tr. at 320. A review of the record reveals no evidence of Plaintiff's failure to follow prescribed treatment. Although other treatment options were mentioned, Plaintiff provided reasons for her failure to pursue those options, including financial hardship and a history of surgical complications. *See* Tr. at 246, 253, 254, 308, 320. The ALJ failed to comply with SSR 96-7p's requirement that he consider Plaintiff's reasons for declining to pursue these treatment options. Aside from his reference to physical therapy and injections, the ALJ did not indicate the specific type of treatment he would expect for a disabled individual to obtain. In light of these failures, the undersigned recommends the court find the ALJ did not cite substantial evidence to discount Plaintiff's credibility based on her treatment history.

Finally, the ALJ noted that medical treatment records showed Plaintiff to be stable and to be having no adverse effects from her medications. Tr. at 19. However, as discussed above, a review of the record as a whole does not support the ALJ's reliance on isolated treatment notes that indicated Plaintiff's pain was stable with her medications and that she tolerated them without side effects. *See Kellough v. Heckler*, 785 F.2d 1147, 1153 (4th Cir. 1986) ("[T]he isolated references in the physician's notes to "feeling well" and "normal activity" are not a substantial basis for rejecting as incredible the claimant's subjective complaints of exertional limitations.").

For all of the foregoing reasons, the undersigned recommends the court find that substantial evidence did not support the ALJ's assessment of Plaintiff's credibility.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

December 2, 2015                         Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).